**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID J. POPKO,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:13-cv-1845** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **PENN STATE MILTON S. HERSHEY** | : | |
| **MEDICAL CENTER, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Before the Court is Defendants Penn State Milton S. Hershey Medical Center, Greg

Wantland, and Mariann Kreiser's motion for summary judgment.  (Doc. No. 66.)  For the

reasons that follow, the Court will grant the motion.

**I.     BACKGROUND**

**A.     Procedural Background**

On July 5, 2013, David J. Popko ("Popko'), initiated the above-captioned action by filing

a complaint against Defendants the Penn State Milton S. Hershey Medical Center (the "Medical

Center"), Greg Wantland, and Mariann Kreiser.  (Doc. No. 1.)  In his initial complaint, Popko

asserted claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"),

the Age Discrimination in Employment Act, 29 U.S.C.A. § 621, et seq. ("ADEA"), and the

Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA"), arising out of his

December 15, 2011, termination, and an allegedly hostile working environment. (Id.)  He also

alleged that Defendants violated the Family and Medical Leave Act, 29 U.S.C.A. § 2601, et seq.

("FMLA"), by interfering with his right to take leave and by retaliating against him for seeking

to take leave.  (Id.)  He further alleged that Defendants breached the contract contained within

1

the Medical Center human resources manual by failing to inform him of his appeal rights at the time of his termination.  (Id.)

After Defendants filed a motion to dismiss Popko's complaint, the Court dismissed all of Popko's claims for failure to state a claim upon which relief can be granted, with the exception of his ADEA age discrimination claim, and his FMLA retaliation claim.  (Doc. Nos. 22, 23.) At the time, the Court granted Popko leave to amend his complaint, except as to the PHRA claims, which it dismissed with prejudice.  (Id.)  Popko subsequently filed an amended complaint, re-pleading most of the claims the Court previously dismissed without prejudice, and adding a gender discrimination claim under Title VII.  (Doc. No. 27.)  Defendants filed a motion to dismiss the amended complaint, and the Court ultimately granted the motion on August 18, 2015, leaving only Popko's claim of termination in violation of the ADEA against the Medical Center, and his claim of FMLA retaliation against all Defendants.  (Doc. Nos. 52, 53.)[1]

On August 15, 2016, Defendants filed their motion for summary judgment (Doc. No. 66), with brief in support (Doc. No. 67), and statement of undisputed material facts (Doc. No. 68). Popko failed to file a brief in opposition to Defendants' motion for summary judgment within twenty-one days of receipt of service of the brief in support, as required by Local Rule 7.6.  On January 26, 2017, the Court issued an Order directing Popko to file his brief in opposition to Defendants' motion for summary judgment by February 28, 2017, and cautioned Popko that failure to do so would result in the Court deeming Defendants' motion unopposed pursuant to Local Rule 7.6.  (Doc. No. 69.)  To date, Popko has not filed  a brief in opposition to Defendants' motion in compliance with the Court's order.  Accordingly, the Court deems

---

[1] At some point in mid-2015, Popko began proceeding pro se in this matter.

Defendants' motion for summary judgment unopposed.

**B.      Factual Background**

Plaintiff Popko began his employment at the Medical Center on January 8, 1973, at the age of twenty-three.[2]  (Doc. No. 68 ¶¶ 8-9.)  Plaintiff held the position of Manager of Supply and Distribution beginning February 1, 1992 until December 15, 2011, when he resigned in lieu of termination.  (Id. ¶ 10.)  At all relevant times, Greg Wantland was Director of Materials Management at the Medical Center, and Mariann Kreiser was a Human Resources Liaison at the Medical Center.  (Id. ¶ 7.)

In December 2010, an employee of the Medical Center, Craig Saaler ("Saaler"), ended his employment with the Medical Center and applied for unemployment compensation benefits.  (Id. ¶ 11.)  The Unemployment Compensation Service Center determined that Saaler was ineligible for benefits.  (Id.)  Thereafter, Saaler filed a Petition for Appeal from the initial determination of ineligibility.  (Id. ¶ 12.)  In his Petition for Appeal, Saaler alleged that he was "sexual[ly] harassed" by his manager and "couldn't put up with it any longer."  (Id.)  Popko was Saaler's manager.  (Id. ¶ 13.)  The Medical Center received Saaler's Petition for Appeal, and on February 1, 2011, Defendant Kreiser sent the Petition to Popko by email, requesting Popko's review of the Petition.  (Id. ¶ 14.)

> In replying to Defendant Kreiser via email on February 1, 2011, Popko provided:
> Nothing should surprise me anymore, but Craig [Saaler] is a desperate man.
> He was a good candidate for disability retirement.  The self-destructive impulse
> to sabotage himself through willful misconduct, knowing he'd be detected,
> is not comprehensible to me.  Now this.

---

[2] The following relevant facts of record are taken from Defendants' statement of undisputed material facts. (Doc. No. 68.)  Defendants' statement of undisputed material facts contains specific citations to the record at each numbered paragraph.

(Id. ¶ 15; Doc. No. 68-2, Exhibit 5 to Popko Dep. at 1.)  Popko did not disclose in his email to

Kreiser that he had engaged in inappropriate conduct or physically touched Saaler in the workplace.

(Id.)

On February 7, 2011, Defendants Wantland and Kreiser and Jim Rohacek (Administrator

of Support Services at the Medical Center) met with Popko regarding Saaler's allegation and the

Medical Center's response.  (Doc. No. 68 ¶ 16.)  On February 11, 2011, Popko signed and dated a

Disciplinary Letter to him from Wantland.  (Id. ¶ 17; Doc. No. 68-2, Exhibit 6 to Popko Dep. at 2.)

The letter provided, in part:

> This letter documents our meeting on February 7, 2011 at which time we discussed
> your violation of the Personal Behavior and Communication Standards Policy,
> HR-38 and the Sexual Harassment Policy, HR 11, specifically your alleged
> inappropriate behavior with a staff employee. . . . Specifically, we discussed that
> on February 2, 2011, it was brought to the attention of Mariann Shearer, HR
> Liaison, that there was an allegation made by an employee, Craig Saaler,
> documented in a Petition for Appeal regarding his Unemployment Compensation.
> This allegation claimed that he was sexually harassed by his Manager, Dave Popko.
> Upon investigation, it was reported that you had kissed Mr. Saaler on the forehead.
> When you were asked during the investigation whether or not the allegation was true,
> you responded that you could not recall engaging in any inappropriate behavior
> with Mr. Saaler.  You did however admit during our meeting that you had kissed
> other male employees on the forehead.  This admission, coupled with our
> investigation leads us to the belief that the allegation made by Mr. Saaler is
> accurate.  As discussed at this meeting, any conduct that has the purpose or
> effect of interfering unreasonably with an individual's work or creates an offensive,
> hostile, or intimidating work environment is prohibited. . . .You have attended
> multiple management trainings in the past and yet have used extremely poor
> judgment in your interactions with members of your staff.  In order to reinforce
> your understanding of sexual harassment and the types of behaviors that may
> give rise to sexual harassment allegations, I am requiring you to attend the
> Sexual Harassment Prevention Training session offered for the New Employee
> Orientation class . . . .It is my expectation that you will immediately cease and
> desist exhibiting any inappropriate behaviors that may be considered offensive
> to employees and/or co-workers in the workplace.  Please be advised that
> unprofessional behavior is unacceptable and will not be tolerated.  Any violation
> of the Personal Behavior and Communication Standards Policy, HR-38 and/or
> Sexual Harassment Policy, HR 11, in the future will result in immediate

termination.

(Doc. No. 68-2, Exhibit 6 to Popko Dep.)

Popko attended a February 14, 2011 training session on sexual harassment prevention, as required by the February 11, 2011 Disciplinary Letter.  (Doc. No. 68 ¶ 18.)  Popko testified at his deposition that he recognized that the conduct which led to the February 11, 2011 Disciplinary Letter was sufficiently "serious" that it "could have led to termination."  (Id. ¶ 19.)

One month after the February 2011 Disciplinary Letter, and less than a month after his sexual harassment prevention training, the Medical Center issued a Final Warning and Notice of Suspension to Popko.  (Id. ¶ 20.)  The Final Warning is dated March 11, 2011, and was signed and dated by Popko on March 28, 2011.  (Id.; Doc. No. 68-2, Exhibit 7 to Popko Dep. at 1-2.)

The March 2011 Final Warning, provided, in pertinent part:

> This letter documents our meeting on March 7, 2011 at which time we discussed your violation of the Personal Behavior and Communication Standards Policy, HR-38 and the Sexual Harassment Policy, HR 11, specifically your alleged inappropriate behavior with a staff employee. . . . Specifically we discussed that on March 4, 2011, it was brought to the attention of Mariann Shearer, HR Liaison, that there was an allegation made by an employee, that you had tapped him on the butt.  When you were asked during the investigation whether or not the allegation was true, you identified the employee and confirmed the allegation.  As discussed at this meeting, any conduct that has the purpose or effect of interfering unreasonably with an individual's work or creates an offensive, hostile, or intimidating working environment is prohibited. . . . Please note that you were issued a disciplinary letter on February 11, 2011 for violation of the Personal Behavior and Communication Standards Policy, HR-38.  You were warned that this behavior is unacceptable and further incidents will result in disciplinary action up to and including discharge.  You were also mandated to the Sexual Harassment Prevention Training which you attended on February 14, 2011. . . . Once again you have used extremely poor judgment in your interactions with members of your staff. In addition to this Final Warning, you will be placed on a two (2) week unpaid suspension beginning March 14th thru March 25th of 2011. . . . Please be advised the unprofessional behavior is unacceptable and will not be tolerated.  Any violation of the Personal Behavior and Communication Standards Policy, HR-38 and/or Sexual Harassment Policy, HR 11, in the future will result in immediate

termination.

(Doc. No. 68-2, Exhibit 7 to Popko Dep. at 1.)

With regard to the grabbing incident which resulted in the March 2011 Final Warning,

Popko testified at his deposition as follows:

Defense Counsel ("Q"): I'm handing you a document that has been marked Popko 6.
Are you familiar with it?

Plaintiff ("A"): Yes.

Q: What is it?

A: Greg Wantland to me, disciplinary letter, February 11, 2011.

Q: I'm directing your attention to the next to last paragraph of Popko 6.  Mr. Wantland
states, it is my expectation that you will immediately cease and desist exhibiting any
inappropriate behavior –

A: Yes.

Q:  – that may be considered offensive to employees and/or coworkers in the workplace.
Did you understand that expectation?

A: Yes.  I was so ecstatic that I followed up with Anthony [Risteff].

Q: What do you mean you were so ecstatic?

A: I was ecstatic that I didn't lose my job.

Q: So you recognized the conduct was serious enough –

A: Yes.

Q:  – that it could have led to termination, correct?

A: Absolutely.  And I . . . grossly underestimated with the impulsive grabbing of the
thigh and saying ["]how does it feel to have . . . someone else's life in your hands.["]

Q: So you are just disciplined for inappropriate conduct, including kissing a male
employee on the forehead, and your next step is to reach out and grab a male employee
between the thigh?

A: On the thigh.

Q: On the thigh?

A: It was an impulsive gesture. . . .

***

A: There are friends and there are foes and I counted him [Anthony] as a friend and he understood me and I understood him.  He taught me a lot of words I never knew the meaning to until he spelled them out to me and they are not for a public dictionary.

Q: Did the policy with respect to sexual harassment and personal behavior and communication standards distinguish between friends and foes?

A: No.

***

Q: And despite being told that unprofessional behavior wouldn't be tolerated, you immediately go off and grab a male employee by the thigh?

A: Everybody has their inner circle.  I mistakenly judged Anthony [Risteff] to be in my inner circle.

***

Q: [T]he disciplinary letter, you signed that on February 11, 2011, didn't you?

A: Yes.

Q: You then have a meeting a few weeks later with respect to the incident regarding Anthony Risteff, don't you?

A: Yes.

Q: Now, [at the March 7, 2011 Meeting], Mr. Wantland reports to you that he received a report that you grabbed Mr. Risteff's butt?

A: Yes.

***

Q: And what response, if any, did you provide to that report?

A: I acknowledged it, yes.

Q: So was that an incident different from the time you grabbed his thigh?

A: No, it was the same thing.

Q: So did you grab his thigh and then grab his butt?

A: No.  I grabbed –

Q: So what did you do?

A: I grabbed his thigh.

Q: Well, you just said you admitted to grabbing his butt.

A: All right.  It's academic.  I grabbed him in his behind quarter.  Okay?
Q: Was it his thigh or his butt?

A: I don't know.

\*\*\*

A: I grabbed where his pocket was.  I guess it was the back of his thigh?

Q: Which was his butt?

A: I don't care.  Whatever you say.

(Doc. No. 68 ¶ 22; Doc. No. 68-2, Popko Dep. at 102-06.)

On March 9, 2011, Popko signed and dated a health care certification form in support of

his request for FMLA leave.  (Doc. No. 68  ¶ 23.)  His health care provider signed and dated the

form March 10, 2011.  (Id.)  The Medical Center received the health care certification form on

April 5, 2011.  (Id.)  Popko was approved for FMLA leave from March 11, 2011 through May

22, 2011.  (Id. ¶ 24.)  Popko was released by his health care provider to fully return to work on

May 23, 2011,[3] with no noted restrictions. (Id.)

On November 16, 2011, Popko stated during a meeting at work that "[his] daughter's bra might make a good bumper" for the corner of a table in a passageway in the Medical Center.  (Id. ¶ 25.)  Popko offered the following testimony at his deposition regarding the incident:

> With regard to the remark I made, . . . my wife and I were going through my daughter's room and we came across a padded bra.
>
> And the next day [at the Medical Center], we were testing to see if these fixed chrome tables would work in this corridor[,] and there were some in favor of it and some opposed to it, but we wanted to see the physical presence of them.
>
> It was brought to my attention that there were sharp ends on them and people will bump their hip.  We need to find some padding.  Maybe we could use my daughter's bra.
>
> My point was that most of the people in S/D knew my daughter as a summer worker . . . and that she was a skinny kid and that whatever padded bra she had would have had had a lot of padding on it and I wanted that to release the tension between the two groups.
>
> And Sandra Hitz took that to [Mariann] Kreiser, and I still cannot believe that that would be grounds for capital punishment for a manager serving 39 years.

(Id. ¶ 26; Doc. No. 68-2 , Popko Dep. at 36-37.)

On December 9, 2011, Defendants Wantland and Kreiser met with Popko regarding the November 16, 2011 bra comment.  (Doc. No. 68 ¶ 27.)  Popko admitted in his deposition that, during the December 9, 2011 meeting, he acknowledged making the bra comment, Defendant Kreiser told him it was an inappropriate comment to make in the workplace, and Defendant Wantland reminded him of the discipline he received in the spring of 2011 for inappropriate

---

[3] While Defendants' statement of undisputed material facts indicates a release date of May 23, 2010, the Intent to Return and Fitness for Duty/Medical Release signed by Popko's health care provider confirms the date was May 23, 2011.  (Doc. No. 68-3 at 16.)

workplace conduct.  (Id. ¶ 28.)  During the December 9, 2011 meeting, Defendants Wantland

and Kreiser told Popko that he was suspended pending investigation.  (Id. ¶ 29.)

>    Popko gave the following deposition testimony regarding the December 9, 2011 meeting:
>
>    Defense Counsel ("Q"): So you recognized that termination may be the consequence
>    for the statement?
>
>    Plaintiff ("A"): They wouldn't have called me up into that office if there wasn't
>    something serious that they regarded –
>
>    Q: So you recognized that –
>
>    A: I did not regard it as serious.  They did.

(Id. ¶ 30; Doc. No. 68-2, Popko Dep. at 123.)

Popko further acknowledged that the bra comment, "[i]n other people's opinion, . . . was

bad judgment" and "sounds terrible from people outside looking in."  (Doc. No. 68 ¶ 30.)  On

December 12, 2011, Popko sent an email to Defendants Wantland and Kreiser and Mr. Rohacek

regarding the November 16, 2011 bra comment.  (Id. ¶31.)  In that email, Popko stated:

>    If this explanation does not mollify culpability for my poor choice of words,
>    I ask you to consider that it is not as egregious as my past failures, that is, not
>    justifying capital punishment.  If change must be made, I ask for a different
>    assignment . . . or permission to retire with dignity.

(Id.; Doc. No. 68-2, Exhibit 14 to Popko Dep.)

On December 15, 2011, Defendant Wantland met with Popko, and informed him that he

had the option to resign, or his employment would be terminated.  (Doc. No. 68 ¶ 32.)  Popko

asked Wantland if his last offense, the bra comment, was serious enough to deserve that

decision.  (Id.)  Wantland responded by saying "[you] will be terminated or you have the option

to resign."  (Id.)  Popko submitted his resignation on that same date.  (Id. ¶ 33.)  During his

deposition, Popko acknowledged that he was not terminated for performance problems, but

rather for "work conduct issues," as follows:

> Defense Counsel ("Q"): [Y]ou weren't terminated for job performance reasons, were you? You were terminated because you kissed men on the forehead, you grabbed a man by his butt, and then you made reference to using your daughter's bra? Those are work conduct issue, right?
>
> Plaintiff ("A"): As – yes.
>
> ***
>
> Q: You kissed men on the forehead, didn't you?
>
> A: That was a long time before that, yeah.
>
> Q: You grabbed Anthony [Risteff] by the butt, didn't you?
>
> A: Yeah.  In my inner circle, I thought.
>
> Q: And you made reference to using your daughter's bra as padding, bumpering?
>
> A: Yes, because, the day we had discovered it in cleaning her room, it was on my mind.
>
> Q: And you made that statement at a time – about your using your daughter's bra [–] when you were on a final warning and had been told to exercise good judgment and not make any inappropriate comments?
>
> A: In the context of working hand in hand with my staff, who knew my daughter.

(Id. ¶34; Doc. No. 68-2, Popko Dep. at 152-53.)

## II.     LEGAL STANDARD

### A.     Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict

for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided tha tone party must prevail on a matter of law.  <u>Id.</u> at 251-52.  In making the determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv. Grp. Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006); <u>accord</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which thay party will bear the burden at trial," summary judgment is warranted.  <u>Celotex</u>, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory or speculative.  <u>Anderson</u>, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Mem'l Hosp.</u>, 192 F.3d 378, 387 (3d Cir. 1999).

    **B.    Unopposed Motion**

Pursuant to Rule 7.6 of the Local Rules of Court for the Middle District of Pennsylvania, a party who fails to submit a brief opposing a motion is deemed not to oppose the motion.  The Court of Appeals for the Third Circuit has held that dismissal of a case for failure to comply with a local rule is a "drastic sanction" which should, with few exceptions, follow a merits analysis. Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991); see also Shuey v. Schwab, 350 F. App'x 630, 632-33 (3d Cir. 2009) (not precedential).  A plaintiff's failure to respond "is not alone a sufficient basis for the entry of a summary judgment." Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990).  Thus, the Court must still determine, even for an unopposed summary judgment motion, whether the motion for summary judgment has been properly made and supported and whether granting summary judgment is appropriate. Anchorage Assocs., 922 F.2d at 175.

In the instant matter, as noted above, Popko has failed to submit any opposition to Defendants' motion for summary judgment.  Therefore, the motion is deemed unopposed. Moreover, because Popko has failed to file a separate statement of material facts controverting the statement filed by Defendants, all facts set forth in Defendants' statement of undisputed material facts will be deemed admitted pursuant to Local Rule 56.1.  Although Popko is deemed not to oppose this pending dispositive motion, the Court must nevertheless satisfy itself that Defendants have met their burden of production and therefore, are entitled to summary judgment as a matter of law.  See Lorenzo v. Griffith, 12 F.3d 23, 38 (3d Cir. 1993); Anchorage Assocs., 922 F.2d at 174-75.

## III.    DISCUSSION

### A.    Legal Standard Applicable to Age Discrimination Claims

Under the ADEA, an employer is prohibited from discharging an individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age.  29 U.S.C. § 623(a)(1).  A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination.  See Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001).  To prevail on an age discrimination claim, "a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action."  Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citation omitted).

Age discrimination claims relying on circumstantial evidence are governed by the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the McDonnell Douglas framework in ADEA cases involving indirect evidence).  Under this framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination.  Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1997)).  Satisfying the prima facie case of age discrimination creates an "inference of unlawful discrimination."  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (quoting Waldron v. SI Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)).  The elements of a prima facie case of age discrimination are as follows: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a

discriminatory motive.  Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013).  The Third

Circuit has indicated that the prima facie case is not "intended to be rigid, mechanized, or

ritualistic."  Pivirotto, 191 F.3d at 253 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 566,

577 (1978)).  Where the plaintiff is not directly replaced, the fourth element is satisfied if the

plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the

consideration of impermissible factors."  Id.

Once a plaintiff establishes a prima facie case creating an inference of discrimination, the

burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the

adverse employment action."  Jones v. Sch. Dist. Of Phila., 198 F.3d 403, 412 (3d Cir. 1999)

(citing Keller, 130 F.3d at 1108)).   The second step of the McDonnell Douglas framework does

not require that the employer prove that the articulated legitimate, nondiscriminatory reason was

the actual reason for the adverse employment action.  Rather, the employer must provide

evidence "that will allow the factfinder to determine that the decision was made for

nondiscriminatory reasons."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

If the employer satisfies this second prong, the burden shifts back again to the plaintiff to

show, by a preponderance of the evidence, that the employer's proffered legitimate,

nondiscriminatory reason was pretextual.  Burton, 707 F.3d at 426-27.  To survive summary

judgment when an employer has articulated a legitimate, nondiscriminatory reason for its action,

a plaintiff must

> point to some evidence, direct or circumstantial, from which a factfinder could
> reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe
> that an invidisous discriminatory reason was more likely than not a motivating
> or determinative cause of the employer's action.

Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 764)).

**B.        Popko's Age Discrimination Claim**

Popko's age discrimination claim is based on his theory that similarly situated, sufficiently younger employees were treated more favorably than he;  that is, that they committed similar acts justifying disciplinary action, but were not terminated.  (Doc. No. 27 at 28-29.)  Defendant Medical Center moves for summary judgment on Popko's age discrimination claim, arguing that Popko has failed to satisfy the fourth element of a prima facie case of age discrimination – production of evidence that "similarly situated" and "sufficiently younger" employees were treated more favorably.  (Doc. No. 67 at 12.) The Medical Center argues that Popko cannot demonstrate that any putative younger comparators were similarly situated to him, and therefore, his age discrimination claim fails.  (Id.)

"To be valid comparators, employees need not be 'identically situated,' but they must be similar in 'all relevant respects.'" Mitchell v. City of Pittsburgh, 995 F. Supp. 2d 420, 431 (W.D. Pa. 2014) (quoting Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009)). Determining whether employees are similarly situated entails a case specific inquiry considering multiple factors, including whether "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" Id. (quoting McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir. 2011) (per curiam)).

The undisputed facts of this case indicate that Popko's pre-termination disciplinary history at the Medical Center involved incidents where he kissed male coworkers on the forehead and grabbed a male coworker on the thigh/butt/hind quarter.  (Doc. No. 68 ¶¶ 16, 20-

21.)  Further, the undisputed facts indicate that Popko received a warning letter and mandatory sexual harassment training for the kissing incident, and a final warning letter for the thigh/butt/hind quarter.  (<u>Id.</u>)  Against this disciplinary background, Popko was terminated after he engaged in inappropriate workplace conduct by referencing his daughter's bra during a workplace discussion.  (<u>Id.</u> ¶¶ 25-34.)  Accordingly, in light of these undisputed facts underlying the circumstances surrounding Popko's termination, prior disciplinary issues and disciplinary status are crucial components of any analysis as to the existence of  "similarly situated" younger co-workers.   Stated simply, "[w]ithout a similar disciplinary history, [a potential comparator] cannot be considered 'similarly situated.'"  <u>Eaton v. Ind. Dep't of Corr.</u>, 657 F.3d 551, 558 (7th Cir. 2011).

The Medical Center maintains that while Popko claims that co-workers more than ten years younger than he engaged in workplace misconduct similar to his own but were not terminated, Popko himself admits that none of these putative comparators was on a "final warning" at the time of the misconduct. (Doc. No. 68-2, Popko Dep. at 66-67.)[4]  Accordingly, the  Medical Center maintains that the testimony of Popko establishes that none of his potential comparators are "similarly situated" so as to establish the fourth prong of a <u>prima facie</u> age discrimination claim.  (Doc. No. 67 at 14.)  The Court must agree, as "[w]ithout a similar disciplinary history, [a potential comparator] cannot be considered 'similarly situated.'"  <u>Eaton</u>, 657 F.3d at 558.  When he was terminated, Popko was on "final warning" status as a result of the

---

[4] In his deposition, Popko alleges that other employees under the age of 40 "made similar types of comments/jokes in the workplace and have not been disciplined for them" and that other employees under the age of 40 "have engaged in horseplay and sexual playfulness/harassment in the workplace and have not been subject to discipline for their conduct." (<u>Id.</u>)

two incidents earlier in the year.  Popko's own testimony establishes that no potential

comparator was on a "final warning" status at the time of the misconduct he references.

Accordingly, Popko has failed to adduce facts that "similarly situated" and "sufficiently

younger" employees were treated more favorably than him, and therefore, he has failed to

establish a prima facie claim of age discrimination.  Thus, the Medical Center is entitled to

summary judgment on Popko's age discrimination claim.[5]

### C.    Legal Standard Applicable to FMLA Retaliation Claim

To prove a claim of FMLA retaliation, a plaintiff must demonstrate that he took FMLA

leave and thereafter suffered an adverse employment decision that was causally related to his

exercise of FMLA rights.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir.

2004).  The burden-shifting framework of McDonnell Douglas, 411 U.S. at 802, is applicable to

FMLA retaliation claims based on circumstantial evidence.  Budhun v. Reading Hosp. & Med.

Ctr., 765 F.3d 245, 256 (3d Cir. 2014).  To establish a prima facie case of FMLA retaliation, a

plaintiff must show that (1) he took an FMLA leave, (2) he suffered an adverse employment

decision, and that (3) the adverse decision was causally related to his leave. Conoshenti, 364

F.3d at 146.  The Third Circuit has described two main factors that are relevant to the causation

element of a prima facie case of FMLA retaliation: (1) timing or (2) evidence of ongoing

antagonism.  Abramson v. Wm. Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001).  As

---

[5] Even assuming that Popko had established a prima facie case of age discrimination,
Defendant Medical Center would still be entitled to summary adjudication in its favor, as it has
adduced significant evidence supporting its articulated, legitimate nondiscriminatory reason for
terminating Popko (i.e., his persistence in inappropriate, unprofessional conduct after two written
warnings and remedial training), and Popko has pointed to no facts indicating such reasons were
pretextual.

discussed in more detail above, under the McDonnell Douglas framework, if an employee establishes a prima facie case, the burden shifts to the employer to provide evidence of a legitimate, nondiscriminatory reason for the adverse employment action.  If that burden is met, an employee must point to some evidence demonstrating that the employer's articulated reasons are pretextual.  Budhun, 765 F.3d at 256 (citations omitted).

### D.    Popko's FMLA Retaliation Claim

Defendants argue that they are entitled to summary judgment on Popko's FMLA retaliation claim as he cannot establish the third element of a prima facie retaliation case - the requisite causal connection between his FMLA leave, which ended in May, 2011, and his discharge nearly seven (7) months later.  (Doc. No. 67 at 16.)  As pointed out by Defendants, the Court previously found in its July 14, 2014 Memorandum on Defendants' motion to dismiss that "there is no temporal proximity between [Popko's spring 2011 FMLA leave] and the subsequent adverse employment decision at the end of the year."  (Doc. No. 22 at 16, citing Walsh v. Wal Mart Stores, Inc., 200 F. App'x 134, 136 (3d Cir. 2006)).  Accordingly, the Court permitted Popko's FMLA retaliation claim to proceed only under the theory that he alleged a "pattern of antagonism" between his spring 2011 FMLA leave and his termination in December 2011.  (Id.)

As to what constitutes a "pattern of antagonism" sufficient to establish causation in a retaliation case, the Third Circuit concluded in Robinson v. Southeastern Pennsylvania Transportation Authority, 982 F. 2d 892, 895 (3d Cir. 1993), that causation was established based on a pattern of antagonism where the plaintiff endured a "constant barrage of written and verbal warnings . . ., inaccurate [performance] point totalings, and disciplinary action, all of which occurred soon after his initial complaints [of race discrimination] and continued until his

19

discharge" approximately two years later. 982 F.3d at 895.  However, the Third Circuit has also

recognized that allegations of "petty intra-office squabbles" fail to amount to the type of

antagonism that establish causation for purposes of a retaliation claim.  See Martinez v.

Rapidigm, Inc., 290 F. App'x 521, 526 (3d Cir. 2008).

Defendants argue that the "pattern of antagonism" alleged by Popko does not suffice to

support a causal connection between his use of FMLA leave in May 2011 and his discharge in

December 2011.  (Doc. No. 67 at 17.)  Popko's amended complaint asserts several instances of

alleged antagonism directed toward him after his use of FMLA leave and before his discharge.

(Doc. No. 27 ¶¶ 38-41.)

First, Popko's amended complaint alleges that a subordinate employee "changed policies

and procedures during Plaintiff's [FMLA] absence."  (Id. ¶ 38.)  However, at his deposition,

Popko testified that "[w]hen I returned, I had found that several of my policies and procedures

had been reversed; and I appealed to Greg Wantland, my immediate supervisor, to restore those.

And I told him why and how and he gave me permission to restore those policies and

procedures."  (Doc. No. 68-2, Popko Dep. at 16.)  This interaction as described by Popko fails to

demonstrate antagonism toward him as a result of his use of FMLA leave; rather, it demonstrates

that Wantland acted responsively to Popko's request.

Second, Popko's amended complaint alleges that he was "ignored" and "ostracized" by

members of management after his FMLA leave up until the time of his discharge, including Scot

Zernick, Jim Rohacek, and Phil Bentley, Sr.  (Doc. No. 27 ¶ 39.)  With regard to Zernick,

Popko's testimony centers around an issue he raised with Zernick and nursing staff regarding a

type of basin used by the nurses as portable toilets.  (Doc. No. 68-2,  Popko Dep. at 46-48.)

Specifically,Popko testified that he was "the butt of a joke for [raising] this [issue] rather than those around me taking it seriously" and that Zernick "dismissed what [Popko] was concerned about." (Id. at 47-48.)  Defendants correctly note that Popko provides no specific information about this incident that would permit a factfinder to conclude that it was in retaliation for  his use of FMLA leave.   As to Popko's allegations regarding Rohacek's behavior, Popko testified that when he tried to meet with Rohacek, he "was speaking to him like [Popko] was already dead" as Rohacek "was in groupthink, lockstep with the rest of them."  (Id. at 48-50.)  As Defendants point out, even assuming that this interaction could be construed as evidence of antagonism, it occurred seven months after Popko returned from his FMLA leave and a short period of time after Popko's comment regarding his daughter's bra.  (Doc. No. 67 at 19.)  Accordingly, it is not indicative of antagonism causally related to Popko's use of FMLA leave.  With regard to Popko's allegations regarding Bentley's behavior, Popko's deposition testimony indicates that Bentley was "less cooperative" with Popko subsequent to his FMLA leave; however, Popko also testified that he and Bentley "were collaborative when [Popko] came back from [his] leave." (Doc. No. 68-2, Popko Dep. at 50-51.)  Accordingly, Popko's testimony fails to establish antagonistic conduct toward him by Bentley.

Popko also alleges in his amended complaint that he was "ostracized" after his return from FMLA leave up until the time of his discharge in December 2011.  At his deposition, Popko offered the following testimony in support of that allegation:

Q: What was the conduct that you point to and say that shows I was being ostracized?

A: I was overridden for things that I was trying to do for efficiency's sake.

Q: What things were you overridden on?

A: To have things in only one place.  I was forced to have supplies in multiple places on the same unit instead of having volume supplies in dialysis, the only user I was required to deliver them in smaller units of measure with the help of mechanical devices that pulled and – tractors that would pull the stuff along hallways or get high bulk items into their storage space.  This was in dialysis.  The only user is Certain Solutions.

Q: Any other incidents in which you allege you were ostracized?

A: I had attempted to acquire space for storage for dialysis in a break room and was told you can't take a break room of somebody – some other department took the break room because I didn't have anybody to join me in the initiative to make a dialysis storage proximate to dialysis.

(Doc. No. 68-2, Popko Dep. at 53-54.)    The Court agrees with Defendants that this testimony does not describe antagonistic conduct but rather reflects operational differences of opinion within Popko's unit.

Accordingly, the Court finds that Popko has failed to adduce facts suggesting a "pattern of antagonism" towards Popko that would permit a reasonable factfinder to determine that a causal connection existed between Popko's FMLA leave and his ultimate discharge seven months later.  Therefore, Popko has failed to establish a prima facie case of retaliation, and Defendants are entitled to summary judgment on Popko's FMLA retaliation claim.[6]

## IV.    CONCLUSION

For all of the reasons discussed above, Defendants' motion for summary judgment (Doc. No. 66), will be granted.  An Order consistent with this Memorandum follows.

---

[6] Even assuming that Popko had established a prima facie case of retaliation, Defendants have adduced significant evidence supporting its articulated, legitimate nondiscriminatory reason for terminating Popko (i.e., his persistence in inappropriate, unprofessional conduct after two written warnings and remedial training), and Popko has pointed to no facts indicating such reason was pretextual.  Thus, summary judgment in favor of Defendants is appropriate.

 s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania